Edna **ROTHSTEIN**, Sylvia Miller and Henrietta Batson, individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

George K. **WYMAN**, as Commissioner of the Department of Social Services of the State of New York, and the Department of Social Services of the State of New York, Defendants.

No. 69 Civ. 2763.

United States District Court
S. D. New York.

Aug. 4, 1969.

Lee A. Albert, Center on Social Welfare Policy and Law, New York City, Lucy Katz, New York City, of counsel, Allen Redlich, Mineola, N. Y., Nassau County Law Services Committee, Avram Weisberger, The Legal Aid Society of Westchester County, Mount Vernon, N. Y., for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. of New York, for defendants, by Philip Weinberg, Principal Atty., New York City, Amy Juviler and Hillel Hoffman, Asst. Attys. Gen., of counsel.

Before HAYS, Circuit Judge, and MANSFIELD and MOTLEY, District Judges.

MANSFIELD, District Judge.

Plaintiffs in this class action are aged, blind and disabled welfare recipients residing in Nassau and Westchester Counties, New York. They receive payments under a cooperative federal-New York State assistance program established pursuant to the Social Security Act, 42 U.S. C. §§ 301 et seq., 1382. The program, which must meet certain federal requirements, is financed jointly by the two governments and administered by the State of New York pursuant to its Social Services Law, McKinney's Consol.Laws, c. 55, § 131 et seq. and regulations promulgated thereunder by its Department of Social Services. Plaintiffs attack a recent amendment of that law, § 131–a, which has resulted in their receiving lower payments than welfare recipients residing in New York City, as violative of the Equal Protection Clause of the Fourteenth Amendment and of certain provisions of the Social Security Act, as amended, 42 U.S.C. §§ 301 et seq., 1202(a) (1), 1352(a) (1) and 1382(a) (1).[1] By way of relief they seek a de-

---

1. "A state plan * * * must * * * provide that it shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory

claratory judgment to the effect that the amendment is unlawful, and preliminary and permanent injunctions enjoining any enforcement and implementation of the amendment that would reduce public assistance payments received by them below the level available to residents of New York City. Defendants have cross-moved for summary judgment.

For the reasons stated herein, preliminary injunctive relief is granted and defendants' motion for summary judgment is denied.

At all times here involved New York's Social Services Law, § 131, has imposed upon state, county, city and town social services officials the duty "to provide adequately for those unable to maintain themselves" and, toward that objective, to assume the responsibility of administering the necessary care, treatment and services to the extent permissible under appropriations made by the State and various local governments forming its subdivisions. Subsection 3 of § 131 provides:

"3. A principal consideration in determining the adequacy of assistance and care [in each case] shall be the sufficiency thereof for maintenance in accordance with standards of public health in the community with due regard for variations in cost from time to time and between localities, *in accordance with the provisions of section one hundred thirty-one-a of this chapter*." (Bracketed portion deleted and italicized portion added in March 1969)

Prior to the recent adoption of § 131–a the State Department of Social Services (which has the duty of promulgating regulations and instituting procedures for the administration and distribution of public assistance in New York State, Social Services Law, § 20), acting pursuant to the foregoing provisions, determined the standards of need and the adequacy of allowances to be made for welfare assistance to various categories (including the aged, blind and disabled) by periodic calculations of the cost of component recurring items required to provide a basic subsistence level, including certain items of food, laundry, household supplies, school expenses, utilities, and personal incidentals. The component items were confined, according to defendants, to the "basics of life" and did not include any allowance for transportation to, or use of, recreational or cultural facilities, such as museums, parks or beaches. Following such studies the Department then established administratively a monthly level or standard of need required by a recipient for these items. Other requirements, including rent, fuel for heat, and various non-recurring, emergency, or special needs, were made the subject of separate or special grants and allowances, which are not in issue here except to the extent that they constitute a background leading to the New York Legislature's effort, in adopting § 131–a in 1969, to simplify the cumbersome and complicated structure of welfare grants within the State by making greater use of the so-called "flat grant" system.[2]

In making the calculations forming the basis of the standard of essential needs, the Department did not engage in a county-by-county analysis of the cost of

upon them." 42 U.S.C. § 302(a) (1) (Old Age Assistance). Identical requirements are found in § 1202(a) (1) (Aid to the Blind); § 1352(a) (1) (Aid to the Permanently and Totally Disabled); and § 1382(a) (1) (the combined program of Aid to the Aged, Blind or Disabled and Medical Assistance to the Aged). Since New York administers a composite program under § 1382, that statute will be referred to herein as the basis for plaintiffs' claim.

2. In 1968 the City of New York with H.E.W. approval, established a demon-

stration project authorizing the elimination of *special* grants for certain clothing and household replacements and the payment, in lieu thereof, of the sum of $100 per year to each recipient. This experiment in the flat grant approach to public assistance was believed by some to offer certain advantages, including less affront to a recipient's dignity than the special grant method, more opportunity for the recipient to budget, reduction of administrative costs, and freeing case-workers for counseling duties.

each of the component items, except with respect to utilities, since the variations in cost between counties was not sufficient to warrant any differentiation. For instance, the relevant schedule of costs published by the Bureau of Labor Statistics, U. S. Department of Labor, which was among the publications used by defendant in making its computations, placed New York City and surrounding counties in the same classification. After defendants thus arrived at proposed levels of need annually, they then rebudgeted the case load for the State, taking into consideration the availability of funds at the local level, and recommended revised standards to the State Legislature.

Prior to the recent enactment of § 131–a the last such cost survey made by the State Department of Social Services was in May, 1968, following which the Department, in August 1968, divided the State into three regions known as "SA–1," "SA–2" and "SA–3," for each of which a separate level was established for recipients in that region. The differences between the levels for the three regions were based on variations in utility costs. The region known as SA–1, as thus established by defendants, included New York City and the counties of Dutchess, Greene, Monroe, Nassau, Suffolk, Ulster and Westchester (herein-

after sometimes referred to as the "surrounding counties"). The level established for recipients in the SA–1 region varied according to the number of persons in each household and the age of the dependent children in the household. The level for a single person household, for instance, was established at $66 per month and was increased in gradations to a high of $464 for a household of 10 persons, the exact amount depending on the age of the various children in the household. The important fact for purposes of the present application is that as of August, 1968 the Department of Social Services had concluded that the cost of the essential recurring items going into the allowance level for welfare recipients did not vary sufficiently between New York City and its surrounding counties to warrant any differentiation between the standards of needs for such recipients. Title 18, N.Y. C.R.R., § 352.4.[3]

On March 31, 1969 the New York Legislature enacted § 131–a (Laws of 1969, ch. 184), which established two schedules of maximum flat monthly grants of public assistance (exclusive of shelter and fuel for heating) allowable to recipients, one applicable to New York City and the other to all other social services districts in New York State, as follows:

Number of Persons in Household

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | Each Additional |
|---|---|---|---|---|---|---|---|---|
| New York City | 70 | 116 | 162 | 208 | 254 | 297 | 340 | 43 |
| Outside New York City | 60 | 101 | 142 | 183 | 224 | 257 | 290 | 33 |

A differential in favor of New York City recipients was thus approved, subject to

change or elimination by defendants' promulgation of a schedule of lesser

**3.** "352.4 *Needs—items of basic maintenance.*

\* \* \* \* \*

"(2) The pre-added monthly allowance schedule for food, clothing, personal incidentals, household supplies, school expenses, utilities, laundry for AABD, expenses incident to AABD,

including sales taxes related thereto, shall be as follows:" (Codes Rules and Regs. of State of N.Y. Title 18, § 352.4)

There follows a schedule of identical monthly sums for New York City and the Counties of Dutchess, Greene, Monroe, Nassau, Suffolk, Ulster and Westchester.

monthly allowance levels for any social services district upon a showing that the total cost of the items required to be provided in the schedule actually was less than the schedule established by regulations of the Department.

On May 2, 1969, the Legislature amended the recently adopted § 131–a (Laws of 1969, ch. 411) to permit the Commissioner to *raise or lower* the levels of the schedules for all districts except New York City upon a showing that such a revision was warranted by the cost of the items included in such schedules, subject to the condition that the levels of schedules for districts outside of New York City could not exceed the maximums prescribed for New York City. Thus, as finally amended, § 131–a established a maximum level for New York City that could not be reduced by defendants and a lower so-called "maximum" level for all other social services districts that could be reduced or increased (notwithstanding its characterization as "maximum") up to the New York City level.

The Legislature's reason for thus differentiating between New York City and its surrounding counties, and for guaranteeing a maximum level to the welfare recipients in the former while subjecting those in the latter to the possibility of an increase or decrease in assistance at defendants' discretion, is a mystery, particularly in view of the Department's past practice of grouping them in one classification on the basis of data that had not changed prior to the adoption of § 131–a. The "Legislative Findings and Purpose" set forth at the outset of the amendment contains a declaration by the Legislature to the effect that it was necessary to establish schedules "based upon the costs of delivering the needs of public assistance recipients in the respective social services districts of the state." However, the only relevant cost data available to the Legislature was the 1968 cost study that had led the Department of Social Services administratively to establish the schedule of needs for recipients in New York City and surrounding counties at identical levels.

The lack of any rationality for the Legislature's differentiation is deepened by the fact that since the 1968 study no further study of the costs of component items going into the levels has been made. Defendant George K. Wyman, Commissioner of Social Services, testified that his Department did not undertake or furnish any other cost study for the assistance of the Legislature and that as far as he knew the only information furnished by his Department to the Legislature pertaining to such grant levels was that forming the basis of the schedules that had been administratively promulgated by him in 1968. He frankly stated that he did not know why the Legislature differentiated between New York City and surrounding counties, and that it was not done on his recommendation.

The "Legislative Findings and Purpose," as well as other evidence furnished by plaintiffs, indicates that budgetary considerations may have played a role in the adoption of § 131–a. At the outset of the amendment the Legislature referred to "the spiraling rise of public assistance rolls and the expenditures therefor, despite [continuous prosperity and high employment]." It went on to emphasize that the new schedules would "release caseworkers for the more important task of providing casework services." Its newly adopted schedules for the most part did not increase the standards of needs for recipients, and in some instances they substantially reduced existing levels. Drastic reductions have been made in allowances for certain special needs not provided for in the basic monthly grants.

On June 5, 1969, pursuant to the authority granted to him by § 131–a, as amended, defendants promulgated schedules increasing the levels of welfare allowances for districts located in surrounding counties to a point where the gap that had been established by the Legislature between them and New York City was partially closed. For instance

the allowance for a single adult household was raised from the $60 established by the Legislature to $65, which brought it within $5 of the $70 level fixed by the Legislature for New York City. Levels for larger households in the surrounding counties were similarly increased to within $4 to $5 per person below the New York City level.[4]

Notwithstanding defendants' earlier decision, based on the only available cost data, that the levels for New York City and surrounding counties should be identical, they now decided that a differential of from $4 to $5 per person could be justified on the ground that New York City recipients were required to spend more money on what was described as the "social cost of living in the urban center" arising out of a "higher level of aspiration," and "greater expectations, the effects of living in a great metropolitan center, and the availability of and need for more recreational facilities than in a suburban or rural environment where children have more space in which to play." Such additional expense, according to defendants, would include "transportation to beaches, museums and parks" and "high laundry and housecleaning expenses due to soot, air pollution and the like." Although defendant Wyman testified that he assumed that certain cultural, medical and recreational facilities (such as museums, parks, community and religious centers, clinics,

children day care centers, and beaches) are more available in New York City to recipients there than are similar facilities to recipients in surrounding counties, and are used to a greater extent by recipients in New York City, he conceded that his Department had no evidence or study supporting his assumption.

There is no evidence that the factor of "social cost of living," as thus defined, was considered by the Legislature at the time when it enacted § 131–a, and defendant Wyman testified that as far as he knew the Legislature did not have before it any evidence pertaining to the cost or use of such cultural opportunities. On the other hand, plaintiffs have furnished extensive evidence, including detailed analyses of transportation costs made by the Nassau County Planning Commission, establishing that the cost of transportation to museums, clinics and other types of recreational facilities in Nassau is substantially higher than that in New York City.[5] Although defendant apparently concedes that the Legislature did not establish the differential between New York City and surrounding counties upon the theory now advanced by him, he points out that the New York City Department of Social Services, in connection with a 1968 demonstration project which provided for a flat annual cyclical grant of $100 per year in lieu of *special* grants to recipients for certain types of clothing and house-

---

4. Plaintiffs have introduced extensive evidence supporting the conclusion that New York City and surrounding counties should be treated identically. The United States Department of Labor's Bureau of Labor Statistics prepares and presents costs of living material for the New York metropolitan area without drawing any distinction in living costs between New York City and the surrounding counties, whereas distinctions are drawn between such metropolitan area and the rest of the state. See, e. g., Three Standards of Living for an Urban Family of Four Persons, U.S. Dept. of Labor, 1969, p. 16; Standard Metropolitan Statistical Areas, U.S. Bureau of the Budget, 1967.

A comparison of cost figures published by New York City, Westchester and Nassau for major items forming components of the grant levels under consideration reveals that the cost of most basic items of food and clothing are identical, whereas most household furnishings cost more in Westchester and Nassau than in New York City, possibly because of greater competition and more second-hand stores in New York City. See Handbook for Case Units, New York City Dept. of Social Services, Jan. 1968; Price Guide Bulletin #9, Westchester County Dept. of Social Service (1967); Price Guide—Clothing & Household Furnishings, Nassau County Dept. of Social Services, Oct. 1, 1968.

5. See affidavit of John Calbreath Burdis, Planning Director, Nassau County Planning Commission, and exhibits thereto.

hold items, stated that "the nature of the urban crisis and the higher social cost of living in the metropolitan center requires a differential assistance level in these areas." However, such *special* grants were for items not embraced by the allowances here under consideration. Furthermore, although defendant Wyman had the foregoing statement available to him in 1968, he nevertheless established identical levels for New York City and its surrounding counties. Thus there is nothing in the record before us at this time to support the theory that the Legislature established a differential based upon a higher "social cost of living" in New York City.

In support of their application for preliminary relief plaintiffs urge that § 131–a and the regulations established by defendants thereunder violate their rights under the Equal Protection Clause of the Fourteenth Amendment for the reason that it creates an irrational, unjustifiable inequality between welfare allowances granted to residents of New York City and those of surrounding counties, with the result that even though the gap has been partially reduced by defendants' administrative action, it is substantial enough to cause irreparable injury to plaintiffs and persons in the same class, who live at a bare subsistence level and for whom the sum of $5 per month can be crucial in mitigating their hardship and suffering and enabling them to survive. In the alternative, plaintiffs urge that § 131–a violates the provisions of the Social Security Act, 42 U.S.C. §§ 302(a) (1), 1202(a) (1), 1352 (a) (1), 1382(a) (1), requiring that standards of need established under a cooperative federal-state assistance program be state-wide and uniform in character.

*The Equal Protection Claim*

■■ Turning first to the constitutional issue, which forms the basis of this Court's jurisdiction under 28 U.S.C. § 2281, we advert initially to certain fundamental principles by which we are governed in assessing plaintiffs' contention that their rights to equal protection have been violated. At the outset we recognize that since the Equal Protection Clause applies to persons rather than places, "[t]erritorial uniformity is not a constitutional requisite," Salsburg v. Maryland, 346 U.S. 545, 552, 74 S.Ct. 280, 284, 98 L.Ed. 281 (1953), and that generally "there is no rule that counties, as counties, must be treated alike." Griffin v. County School Board, etc., 377 U.S. 218, 230, 84 S.Ct. 1226, 1233, 12 L.Ed.2d 256 (1963). With the needs and desires of its various subdivisions in mind, a state has the constitutional power to legislate in a manner which may create inequalities between those residing within different local governmental units, provided the statutory discriminations rest on grounds relevant to the statute's purposes. Griffin v. County School Board, etc., *supra;* McGowan v. Maryland, 366 U.S. 420, 425, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1960); Salsburg v. Maryland, *supra.* However, a legislative discrimination which is purely arbitrary and draws invidious, irrational distinctions cannot withstand a Fourteenth Amendment attack. Gulf, Colorado & Santa Fe Ry. Co. v. Ellis, 165 U.S. 150, 17 S.Ct. 255, 41 L.Ed. 666 (1896).

■ The line between constitutionally permissible and impermissible legislative inequalities is far from crystal clear. "Notions of what constitutes equal treatment for purposes of the Equal Protection Clause *do* change." Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 669, 86 S.Ct. 1079, 1083, 16 L.Ed.2d 169 (1965). Certain broad principles, however, are now well established. When the challenged classifications pertain to the conduct of business transactions, the Supreme Court has freely recognized the difficult problems and interests that state legislatures must balance. In such cases, even though the reason for the statute may be unstated and difficult to discern from surrounding circumstances, the presumption in favor of validity is favored. Brown v. Maryland, 25 U.S. (12 Wheat) 419, 436, 6 L.Ed. 678 (1827), and we are guided

by the principle that "[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1960) (state Sunday closing laws). Absent an invidious distinction, or one affecting a fundamental or critical personal right, wisdom dictates that in the interest of maintaining a proper balance between state and federal authorities the Equal Protection Clause should not be used to interfere with the state legislative process. The need or appropriateness of legislation is to be determined by the legislature, not the courts, and the latter should not substitute their economic or social beliefs for those of the former. Ferguson v. Skrupa, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1962). We do not "sit as a superlegislature." Salsburg v. Maryland, 346 U.S. 545, 550, 74 S.Ct. 280, 98 L.Ed. 281 (1953). Traditionally such business and economic legislation, even though it might create inequalities, has withstood attack if it could possibly bear some reasonable relationship to the statutory purpose. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911) (regulating drilling for natural gas); Morey v. Doud, 354 U.S. 457, 463, 464, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957) (regulating use of premises as "currency exchanges"); Williamson v. Lee Optical Co. of Oklahoma, 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1954) (regulating the sale of eye glasses); Ft. Smith Light & Traction Co. v. Paving Dist. No. 16, 274 U.S. 387, 47 S.Ct. 595, 71 L.Ed. 1112 (1926) (imposing duty to repair on street railways).

Where legislative classifications create inequalities affecting the exercise of fundamental or critical personal rights, however, a more stringent stand-ard is applied in determining whether such distinctions are prohibited by the Equal Protection Clause. Particularly where they operate to the detriment of a disadvantaged minority, they are "closely scrutinized and carefully confined," Harper v. Virginia State Bd. of Elections, *supra*, 383 U.S. at 670, 86 S.Ct. 1079. Mere speculation as to a possible rational basis or justification for the distinction is insufficient. "Such a law, even though enacted pursuant to a valid state interest, bears a heavy burden of justification, * * * and will be upheld only if it is necessary, and not merely rationally related, to the accomplishment of a permissible state policy." McLaughlin v. Florida, 379 U.S. 184, 196, 85 S.Ct. 283, 291, 13 L.Ed.2d 222 (1964) (striking down state law prohibiting interracial marriage). The standard has more recently been described in even stricter terms as one making constitutionality depend upon whether the statute "promotes a *compelling* state interest." Shapiro v. Thompson, 394 U.S. 618, 638, 89 S.Ct. 1322, 1333, 22 L.Ed. 2d 600 (1969) (holding unconstitutional residency requirements for welfare payments); see also Hobson v. Hansen, 269 F.Supp. 401, 506–507 (D.C.1967) (Wright sitting by designation).

Receipt of welfare benefits may not at the present time constitute the exercise of a constitutional right.[6] But among our Constitution's expressed purposes was the desire to "insure domestic tranquility" and "promote the general Welfare." Implicit in those phrases are certain basic concepts of humanity and decency. One of these, voiced as a goal in recent years by most responsible governmental leaders, both federal and state, is the desire to insure that indigent, unemployable citizens will at least have the bare minimums required for existence, without which our expressed fundamental constitutional

6. Welfare assistance does represent a statutory right, as distinguished from charity. If a person meets the requirements prescribed by statute under a federally assisted program, the agency is obligated to recognize his claim. See Reich, The New Property, 73 Yale L.J. 733, 785–786 (1964); Note, Development in Law, Equal Protection, 82 Harv.L.R. 1065, 1192 (1969).

rights and liberties frequently cannot be exercised and therefore become meaningless.[7] Legislation with respect to welfare assistance, therefore, like that dealing with public education, access to public parks or playgrounds, or use of the mails, deals with a critical aspect of the personal lives of our citizens, whether such assistance be labelled a "right," "privilege" or "benefit." See Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1962). Its importance is magnified by the defenseless and disadvantaged state of the class of citizens to which it relates, who are usually less able than others to enforce their rights. It can hardly be doubted that the subsistence level of our indigent and unemployable aged, blind and disabled involves a more crucial aspect of life and liberty than the right to operate a business on Sunday or to extract gas from subsoil. We believe that with the stakes so high in terms of human misery the equal protection standard to be applied should be stricter than that used upon review of commercial legislation and more nearly approximate that applied to laws affecting fundamental constitutional rights. Poverty is a bitter enough brew. It should not be made even less palatable by the addition of unjustifiable inequalities or discriminations. It must not be forgotten that in most cases public assistance represents the last resource of those bereft of any alternative. Equity (the state or quality of being equal, derived from the latin *aequitas*), should least of all be denied the poor.[8]

■ Applying the foregoing principles to § 131–a of the Social Services Law, we must conclude, on the basis of the record now before us, that the differential between allowance levels established for welfare recipients in New York City and those in surrounding counties constitutes an arbitrary, invidious and irrational inequality in violation of the Equal Protection Clause, even when judged by the traditional, rather than the more stringent, standard. Turning first to the statute itself, if the Legislature had not gone to the trouble of expressly stating its "Findings and Purpose" more room might exist for speculation as to a possible reasonable basis for the unequal treatment of recipients. But its reasons are expressed, and in some detail. While recognizing certain advantages in a uniform schedule of monthly grants and allowances, the statement fails completely to provide any reason for the uneven treatment of recipients in New York City, on the one hand, and those in surrounding counties, on the other, except to imply that it was the result of budgetary considerations.

There is not a scintilla of evidence that the difference between the level of the schedules prescribed by the Legislature for New York City and for its surrounding counties, respectively, could be justified on the basis of a difference in cost of the essential items forming the basis of those levels. Indeed, the evidence before us is clear and undisputed that the cost of those essential items was the same for New York City as for the seven surrounding counties. In the face of such convincing and uncontroverted evidence we cannot, therefore, assume that the Legislature founded the statutory disparity upon a geographical vari-

---

7. The concept was expressed by President Roosevelt in his June 8, 1934 message to Congress recommending legislation on economic security:

"Among our objectives I place the security of the men, women, and children of the Nation first.

"This security for the individual and for the family concerns itself primarily with three factors. People want decent homes to live in; they want to locate them where they can engage in productive work; and they want some safe-guard against misfortunes which cannot be wholly eliminated in this manmade world of ours."

The substance of the message has been repeated by every President since that date.

8. Our constitutional guarantees dictate the abandonment of a philosophy, which has long prevailed in many quarters, that the poor and disabled must be treated as "nonpersons," allowed to receive charity but not entitled to equal rights.

ation in cost of the component items. Nor would we be warranted in upholding the discrimination as being in furtherance of a legislative desire to reduce welfare costs, an objective recently rejected by the Supreme Court in Shapiro v. Thompson, *supra:*

> "We recognize that a State has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program. But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens. It could not, for example, reduce expenditures for education by barring indigent children from its schools. Similarly, in the cases before us, appellants must do more than show that denying welfare benefits to new residents saves money. The saving of welfare costs cannot be an independent ground for an invidious classification." (Shapiro v. Thompson, 394 U.S. 618, 633, 89 S.Ct. 1322, 1330 (April 22, 1969))

Thus a reduction in welfare benefits is permissible under the Equal Protection Clause only if it is not effected through arbitrary inequalities.

Pursuant to the provisions of § 131–a as enacted by the Legislature, defendant Wyman might have promulgated new schedules for the surrounding counties, which would raise their allowance levels to the level prescribed for New York City. In that event the constitutional issue before us might have become moot, a

consideration which prompted the three-judge court in Rosado v. Wyman, 304 F.Supp. 1356 (D.C.1969) to dissolve itself and remand that case to Judge Weinstein.[9] However, although Commissioner Wyman has reduced the gap between the levels for New York City and the surrounding counties by promulgation of new schedules, there remains a difference of approximately $4 to $5 per person between the levels of the two schedules. While this may seem minor to most citizens, it is of crucial importance to the recipients here, who present tragic hardship cases, some of them already the victims of severe cutbacks in other forms of special aid formerly received (e. g., telephone service for medicines and groceries; food for seeing-eye dogs; transportation allowances to hospitals; special diets for diabetics; readers for the blind; "homemakers" for those confined to wheelchairs; etc.). To an indigent person now receiving approximately 90¢ per day for food, an additional 15¢ per day can hardly be described as *de minimus.* Access to such bare necessities of life, on a non-discriminatory basis, involves a critical interest for those whose life depends on it.[10] The issue has not, therefore, been mooted and the constitutional question remains a substantial one.

The bases advanced by defendant for upholding § 131–a, or at least deferring preliminary relief, are wholly lacking in persuasion. The first of these is that the needs of New York City welfare recipients are greater than those of recipients elsewhere because of what is termed "the higher social cost of living." At first blush there might appear to be

9. The surrounding counties would still be discriminated against to the extent that § 131–a, as amended, guarantees New York City recipients the maximum level, whereas those in surrounding counties are forced to establish that the total cost of items included in the schedules applicable to their districts is more than the cost thereof reflected in such schedules. Since the evidence before us, however, indicates that the costs are identical, the Commissioner would be required to raise the levels of the surrounding counties to that of New York City.

10. The standards promulgated under the Social Services Law are described by Joseph S. Barbaro, Commissioner of Social Services for Nassau County, who has carefully studied the needs of welfare recipients, as follows:
"The present standards of assistance provide for life on a level of sustenance, nothing more, and often less. The standards which will go into effect on July 1, 1969 provide for even less." (Aff. of Joseph S. Barbaro, sworn to June 19, 1969)

something to the proposition that the plight of the welfare recipient living in grim and dismal quarters in a New York City ghetto is so miserable and frustrating that he is led to make greater use of parks, beaches, museums, recreational and cultural centers than is the recipient in the City's suburban counties, particularly since these facilities are within easier reach in New York City. The need for such facilities, referred to euphemistically by defendants as arising from "a higher level of aspiration" and "greater expectations," would require funds not only for transportation but also for payment for use of those not furnished free of charge (e. g., admission fees to a semi-public beach).

In the absence of an iota of evidence to support an assumption that welfare recipients encounter such a "higher social cost of living," we find ourselves unable to accept it. We question whether the aged, blind and disabled are able, in view of their physical handicaps, to make any appreciable use of many of the facilities described by the defendant, such as beaches and museums. Furthermore, is it reasonable to assume that welfare recipients living at or below a subsistence level, who are provided for their nutritional needs with less than $1 per day (the buying power of which is diminishing weekly as the cost of living rises sharply [11]), will sacrifice any substantial part of their meager payments in favor of cultural, recreational and educational benefits? We doubt it. Even if it could be shown that a part of such payments is used for these purposes, defendant erroneously assumes that welfare recipients in the suburban counties live in more pleasant and less frustrating surroundings than those in New York City. The picture of suburban welfare recipients living in garden apartments (the term used on oral argument), located on the edge of a park, is an unreal one. It ignores the existence of many rundown tenements in the slum districts of our surrounding suburban counties, which unfortunately provide the principal housing facilities for welfare recipients. Under such circumstances we cannot accept the proposition that recipients living in similar conditions in New York City need or use recreational or cultural facilities more than do recipients in suburban areas.

In any event, extensive and reliable proof has been offered by plaintiffs to the effect that the cost of transportation to recreational facilities, museums, beaches and hospitals in the surrounding counties, such as Nassau, is substantially greater than that incurred by New York City residents who are located closer to such facilities and have cheaper transportation available to them. For instance, while New York City residents can normally travel quickly to parks, beaches, museums and hospitals for the cost of a subway ride (ten cents each way for the elderly, twenty cents for all others), residents outside of New York City are faced with public transportation provided by a number of private companies at much higher costs (up to $1.70 per trip), requiring numerous transfers and considerably more time and expense. Consequently, defendants' argument that the disparity in levels is justified by New York City residents' increased need for and cost of transportation to such facilities must be rejected on the record before us.

■ We also find no merit in defendants' further argument that in view of the pendency of a petition by Nassau County for an increase in the allowance levels promulgated for it and the availability to surrounding counties of various other state remedies as a means of seeking an increase in the level of payments available to them, the constitutional issue is not ripe for determination. The situation has changed substantially since the three-judge court in Rosado

11. For example, the United States Department of Labor announced that for the first six months of 1969 the cost of living in the New York City area was increasing at the rate of 6.4% per year, which continued the trend experienced in 1968. New York Times, July 24, 1969, page 1, col. 1.

v. Wyman dissolved itself on the ground that the issue raising its jurisdiction (essentially the issue now before this Court) might be rendered moot by administrative action. Administrative action now has been taken and it has failed to moot the issue. Any further delay could work substantial and irreparable injury to plaintiffs. We have no assurance that the issues would be promptly resolved by any of the state court procedures suggested by defendants. No reasons exist, therefore, for absentention;[12] and exhaustion of state court remedies is not a prerequisite. King v. Smith, 392 U.S. 309, 312, fn. 4, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); Damico v. California, 389 U.S. 416, 88 S. Ct. 526, 19 L.Ed.2d 647 (1967); McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); Frozen Food Express v. United States, 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910 (1956); Holmes v. New York City Housing Authority, 398 F.2d 262 (2d Cir. 1968).

### *The Claim of Violation of the Social Security Act*

In view of our disposition of the constitutional issue, upon which our jurisdiction is grounded, it is unnecessary to dwell at length on plaintiffs' alternate contention that § 131–a violates applicable provisions of the Social Security Act, an issue over which this Court has pendent jurisdiction. Smith v. King, 277 F.Supp. 31 (D.C.1967). Plaintiffs' argument is founded on the proposition that 42 U.S.C. § 302(a) (1) and § 1382(a) (1), and regulations promulgated thereunder by the Department of Health, Education and Welfare ("H.E.W."), require states participating in federally-financed assistance programs to conduct them on a state-wide basis pursuant to uniform standards. Applying that principle here, plaintiffs contend that, while the application of such uniform standards may lead to different levels of assistance in different areas of a state, § 131–a is fatally defective for the reason that it simply creates disparities arbitrarily and without adoption or application of uniform standards. See King v. Smith, 392 U.S. 309, 326–327, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968).

Section 302 deals with state plans for old-age assistance and medical assistance for the aged while § 1382 is concerned with State plans for aid to the aged, blind and disabled, and medical assistance for the aged. Both statutes require in subsection (a) (1) that any such plan

"* * * provide that it shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them."

Further support for a requirement of state-wide uniform standards is found in regulations recently promulgated by the H.E.W., 34 Federal Register No. 19, pp. 1394–1395 (Jan. 29, 1969), and codified as 45 C.F.R. § 233.20, which direct that state plans "[p]rovide that the standard [of assistance] will be uniformly applied throughout the State," 45 C.F.R. § 233.-20(2) (iii), and

"[p]rovide that payment will be based on the determination of that amount of assistance needed and that, if full individual payments are precluded by maximums or insufficient funds, adjudgments will be made by methods applied uniformly statewide." 45 C.F.R. § 233.20(3) (viii)."

On their face the foregoing provisions of the Social Security Act and regulations would appear to be aimed at the fundamentally sound objective of assuring that persons in like circumstances

---

12. Unlike the situations in Harrison v. N. A. A. C. P., 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959), and Fenster v. Leary, 264 F.Supp. 153 (S.D.N.Y. 1966), affd., 386 U.S. 10, 87 S.Ct. 862, 17 L.Ed.2d 701 (1967), the facts here reveal a classic instance of the type of special circumstance calling for exercise of federal jurisdiction. See Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); and Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

should be treated equally throughout a state rather than exposed to the type of unfair hodgepodge that could result from adoption of different eligibility standards or other criteria for different areas. Indeed, a quotation cited by plaintiffs from a letter of James Callison, H.E.W. Regional Commissioner for Region II (which includes New York State) to defendants, dated April 16, 1969, indicates this was the H.E.W.'s objective in inquiring whether the differential between levels promulgated under § 131–a for New York City and other areas of the State "may be justified on the basis of differences in the cost of living in local areas." Plaintiffs' non-constitutional argument, however, is based primarily on regulations promulgated by H.E.W. Since the schedules and regulations adopted by defendants are now under review by that agency, which possesses considerable expertise with respect to its own regulations and should be entitled to interpret them in the light of the complexity of problems presented by various welfare programs, see 45 C.F.R. § 233.20(1), we at this stage defer determination as to the requirements of the Social Security Act in anticipation of a ruling by H.E.W.

*Preliminary Relief*

 Having thus made a clear showing of probable success, plaintiffs have also demonstrated that denial of preliminary relief will work a much more severe hardship upon them, amounting to irreparable injury, than any hardship that would result to defendants from the granting of preliminary relief. Clairol Incorporated v. Gillette Company, 389 F. 2d 264 (2d Cir. 1968); Unicon Management Corp. v. Koppers Company, 366 F. 2d 199, 204 (2d Cir. 1966); Dino De Laurentiis Cinematografica, S.p.A. v. D–150, Inc., 366 F.2d 373, 375 (2d Cir. 1966). To plaintiffs the difference between the monthly payments to them and to recipients in New York City represents the bare essentials of life, whereas if defendants should ultimately prevail any such differentials paid in the interim to plaintiffs and others similarly situated

would be recoverable or offset against future allowances. Since no issue has been raised, upon this application for preliminary relief, as to the classification of the lawsuit as a class action under Rule 23, F.R.Civ.P., the action will be treated as such for purposes of temporary relief.

Accordingly, plaintiffs' motion for preliminary relief is granted to the extent that pending trial and final determination of the action defendants will be restrained from further enforcement or implementation of § 131–a of the New York Social Services Law, or from promulgating schedules of grants and allowances of public assistance, or making payments thereof to recipients, other than according to objective, non-discriminatory standards based upon the cost of the needs of such recipients. Trial of the action will commence on October 6, 1969 at 10:00 A.M. Defendants' motion for summary judgment is denied.

The foregoing constitutes the Court's findings of facts and conclusions of law pursuant to Rule 52(a), F.R.Civ.P.

Submit order on notice in accordance with Rule 65(d), F.R.Civ.P.