**Cynthia GUIDICE, et al., Plaintiffs,**

v.

**Larry D. JACKSON, etc., Defendant.**

**Civ. A. No. 89–00390–R.**

United States District Court,
E.D. Virginia,
Richmond Division.

Dec. 7, 1989.

Jill A. Hanken, Virginia Poverty Law Center, Inc., Richmond, Va., William L. Botts, III, Rappahannock Legal Services, Inc., Fredericksburg, Va., Alda White, Staf-

ford County Atty., Stafford, Va., for plaintiffs.

Mary Sue Terry, Atty. Gen. of Va., John A. Rupp, Sr. Asst. Atty. Gen., Thomas J. Czelusta, Asst. Atty. Gen., Richmond, Va., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

This matter is before the Court on cross motions for summary judgment. Plaintiffs allege that Virginia's Aid to Families with Dependent Children (AFDC) program as applied to the residents of Stafford County, Virginia violates federal law and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by denying them the same level of benefits that similarly situated residents in other localities receive. Plaintiffs seek declaratory and injunctive relief. Jurisdiction is based on 28 U.S.C. § 1331, 1343(3) and (4), 2201, and 2202.

The parties agree on all material facts; thus, the case is ripe for disposition on the instant cross motions for summary judgment.

For the reasons set forth below, the Court concludes that Virginia's AFDC program does not violate federal law or the Fourteenth Amendment.

## I. *Background*

Plaintiffs are a class of AFDC and Medicaid applicants and recipients who reside in Stafford County, Virginia and depend upon AFDC, Medicaid and other public assistance programs for their financial subsistence.[1] The plaintiffs are suing defendant Larry Jackson in his official capacity as Commissioner of the Virginia Department of Social Services (DSS). Jackson in turn filed a complaint against the Secretary of the United States Department of Health and Human Services (HHS), as a third party defendant, who was by Order of August 3, 1989 severed from the original proceedings.

The AFDC program was established by Title IV of the Social Security Act of 1935 to provide financial assistance to needy dependent children and the parents or relatives who live with them. *See* 42 U.S.C. § 601. AFDC aid is administered by the states, and the federal government reimburses participating states for a portion of the funds they expend. 42 U.S.C. § 603. In order to qualify for reimbursement, state plans must be approved by the Secretary of HHS and satisfy the requirements for plan administration and recipient eligibility specified in 42 U.S.C. § 602(a). 42 U.S.C. § 602(b); *Deel v. Jackson*, 862 F.2d 1079, 1081 (4th Cir.1988).

The eligibility guidelines and benefits provided by Virginia's AFDC program and Medicaid program[2] vary between localities according to cost-of-living differences. In 1973, DSS conducted a statewide study of actual costs and established standards for three groups of localities throughout the state. The standards took effect on July 1, 1974. Each Virginia locality was placed in one of the three groups. Group I, the lowest cost-of-living locality, has the lowest benefits and the highest eligibility requirements. Conversely, Group III has the highest benefits and the lowest eligibility requirements. Because of its rural nature, its low shelter costs, and its low cost-of-liv-

**1.** On July 14, 1989, this Court certified a plaintiff class consisting of Stafford County residents
    (1) who receive AFDC benefits; or,
    (2) whose applications have been or will be denied since June 22, 1987 because their countable income exceeds Group I eligibility levels but would qualify for AFDC if Group III were used; or,
    (3) who receive Medicaid; or,
    (4) whose applications for Medicaid have been or will be denied since June 22, 1987 because their incurred medical expenses do not meet Group I eligibility levels, but do meet Group III eligibility levels.

**2.** The eligibility requirements for Virginia's Medicaid program depend upon the AFDC payment level. 42 U.S.C. § 1396a *et seq.* All AFDC recipients are eligible for Medicaid benefits, 42 U.S.C. § 1396a(a)(10)(A)(i). Further, those persons who are "medically needy" because of high medical expenses also qualify. Eligibility levels for "medically needy" can be no higher than 133% of the AFDC payment levels. 42 U.S.C. § 1396(b)(f)(1)(B)(i)); 42 C.F.R. § 435.811, 845, § 435.1007.

ing, Stafford County was placed in Group I.

Each group has a different "standard of need" which determines the eligibility level and the payment level for AFDC benefits. The standard of need is an amount set by the DSS Board that reflects the state's judgment as to the minimum amount necessary to assure economic security. *Gardenia v. Norton*, 425 F.Supp. 922, 926 (D.Conn.1976). Thus, the standard of need is "a yardstick for measuring who is eligible for public assistance." *Rosado v. Wyman*, 397 U.S. 397, 408, 90 S.Ct. 1207, 1215, 25 L.Ed.2d 442 (1970).

Federal regulations allow a state that is unable to meet the full standard of need to make a ratable reduction in its payment level. 45 C.F.R. § 233.20(a)(2)(ii). Virginia's current AFDC payment level is 90% of the standard of need. Localities may increase the payments to 100%; however, Stafford County has not exercised this option.

Since 1973, Stafford County has experienced dramatic changes in its cost-of-living and has lost its rural nature. It is part of the District of Columbia Metropolitan Statistical Area and is the second fastest Virginia County in population growth. According to the 1989 Fair Market Rents, published by the United States Department of Housing and Urban Development (HUD), Stafford County's shelter costs are the highest in Virginia. In 1987, Stafford County formally requested DSS to move the County from Group 1 to Group III. DSS refused because of a lack of General Assembly funding.

Since the original groupings in 1974, Stafford County has remained in Group 1 even though its cost-of-living presently meets or exceeds the costs-of-living in Group III localities. Localities with comparable costs-of-living include those immediately adjacent to Stafford County, such as the City of Fredericksburg and Prince William County. Yet, these localities are included in Group III. Thus, Prince William AFDC beneficiaries receive approximately $90 per month more than their neighbors in Stafford County. Further, because of

Medicaid's dependence upon AFDC levels, in order to qualify for Medicaid, a single person in Stafford County would have to incur $650 per year more in medical expenses than a single person with the same income in Prince William County.

If Stafford County were moved to Group III, AFDC benefits would increase and more applicants would be eligible for assistance. While the state appropriates approximately $84 million annually for AFDC, the move of Stafford County from Group I to Group III would cost the state approximately $155,400 annually in additional AFDC and Medicaid expenditures. (The $155,400 would be matched by federal funds.)

Since 1974, the defendant has transferred only one locality: in 1982, Loudoun County was moved from Group 1 to Group II. Two years later, seven other localities requested transfers based upon DSS's criteria used for transferring Loudoun County. DSS denied every request because of insufficient funds.

In 1984, under the direction of the Virginia General Assembly, DSS commissioned a study by Ernst and Whinney to determine "[w]hether the current standards ... and agency groupings adequately reflect the needs of the AFDC and General Relief populations." The Ernst and Whinney study used fair market data established by HUD to analyze shelter cost differences among localities. The study pointed to the significant differences in shelter costs and, among other suggestions, recommended that Stafford County be shifted to Group III.

After considering the report, the DSS Board asked the defendant to develop a proposal with four payment groups. Ultimately, in July 1985, the Board adopted a proposal which was published in the Virginia Register of Regulations that would have regrouped Virginia localities to assure a more equitable distribution of funds. 1:20 Va.Reg. 1700–1706, 1743–1745 (July 8, 1985). Pursuant to the proposed regulations, DSS would have increased the AFDC standards of need and transferred sixty-two of Virginia's localities into different

groups. Stafford County was the only locality recommended for movement from Group I to a newly proposed Group IV.

By letter published in the Virginia Register of Regulations, then Governor Charles S. Robb withheld his approval of the DSS's proposed regulations and recommended that DSS withhold further action pending review of the budgetary report by the Governor's Office and the General Assembly. DSS sought appropriation for the new groupings, but the Governor's 1986 Budget did not include the funds. Eventually, the House/Senate Conferees eliminated the requested funding to revise the AFDC standards of need and DSS's proposed regulation were never adopted.

## II. *Discussion*

Plaintiffs claim violations of both federal statutory law and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The Court must first consider the statutory claims.

The Social Security Act, enacted in 1935, authorizes funds for state plans that help families with needy dependant children. 42 U.S.C. § 601. In order to qualify for federal funds, the state plans must conform with requirements of the Social Security Act and with rules and regulations promulgated by HHS. 42 U.S.C. § 602. The plan must be approved by the Secretary of HHS. 42 U.S.C. § 601. The Social Security Act also requires uniform statewide administration of the AFDC public assistance program:

A State plan for aid and services to needy families with children must

(1) provide that it shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them;

(2) provide for financial participation by the State;

(3) either provide for the establishment or designation of a single State agency to administer the plan, or provide for the establishment or designation of a single State agency to supervise the administration of the plan

. . . .

42 U.S.C. § 602(a)(1)–(3).

Upon enactment of the social security laws, the Presidential Committee on Economic Security recognized that the effectiveness of AFDC, like that of pension laws, would depend largely on broad state involvement. The Committee recommended that responsibility for administration of the assistance be centralized within the state to "avoid a diversity of operating standards in the subdivisions within the [s]tate[s]." Social Security Board, Social Security in America, A Summary of Staff Reports of the Committee on Economic Security, 161, 191 (1937). In Virginia, DSS is responsible for the state-wide administration of the program.

The federal regulations that implement 42 U.S.C. § 602(a)(1)–(3) also require uniformity in AFDC administration and equitable treatment of individuals in similar circumstances within each state.[3] Further,

---

**3.** The following are regulations that implement 42 U.S.C. § 602(a).

45 C.F.R. § 205.120(a)(1) provides:
[A state plan for AFDC] shall be in operation ... on a statewide basis in accordance with equitable standards for assistance and administration that are mandatory throughout the state.

45 C.F.R. § 205.130(a)(2) provides:
State and federal funds will be apportioned among the political subdivisions of the State on a basis consistent with equitable treatment of individuals in similar circumstances throughout the state.

45 C.F.R. § 233.10(a)(1) provides:
... [T]he eligibility conditions imposed must not exclude individuals or groups on an arbitrary or unreasonable basis, and must not result in inequitable treatment of individuals

or groups in the light of the provisions and purposes of the public assistance titles of the Social Security Act. Under this requirement:

...

(iv) [e]ligibility conditions must be applied on a consistent and equitable basis throughout the state.

45 C.F.R. § 233.20 provides in part:
(a)(1)(i) the determination of need and amount of assistance for all applicants and recipients will be made on an objective and equitable basis ...
(2)(iii) standard will be uniformly applied throughout the state ...
(3)(viii)(B) if full individual payments are precluded by maximums or insufficient funds, adjustments will be made by methods applied uniformly statewide.

the United States Department of Health, Education, and Welfare (HEW) (now the United States Department of Health and Human Services (HHS))[4] published in its Handbook of Public Assistance Administration further provisions requiring equitable treatment throughout the state. For example,[5]

> [S]tate policies, standards and methods will apply equally to persons in like situations wherever they may live.... [T]he specific eligibility factors for each assistance program, including resources and standards of need, ... [must be] uniformly applied in area offices or political subdivisions.

HEW Handbook of Public Assistance Administration, Part II § 4300.

While the State plans must conform to federal law, Congress gave the states primary responsibility for administering the programs. The states have great flexibility in the administration of the program, particularly in the area of determining eligibility requirements. *King v. Smith,* 392 U.S. 309, 318, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1967). Further, the Supreme Court has recognized the importance of the state role and emphasized that Congress cannot prescribe every detail of the complex AFDC program. *New York State Department of Social Services v. Dublino,* 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973). In *Dublino,* the Court refused to invalidate state work rules holding that "[i]f Congress had intended to pre-empt state plans and efforts in such an important dimension of the AFDC program, such intentions would in all likelihood have been expressed in direct and unambiguous language." *Id.* at 414, 93 S.Ct. at 2513. This Circuit recently adopted the deferential approach of *Dublino* and stated the test for determining the efficacy of state rules. *Deel v. Jackson,* 862 F.2d 1079 (4th Cir.

1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 2434, 104 L.Ed.2d 991 (1989). The proper approach is to presume that state initiatives are valid in the absence of a clear statement of congressional disapproval. *Id.* at 1084. At the same time, however, a state rule that conflicts with a valid federal regulation is invalid under the Supremacy clause. *See Blum v. Bacon,* 457 U.S. 132, 145–146, 102 S.Ct. 2355, 2363–64, 72 L.Ed.2d 728 (1981).

On three grounds, the *Deel* plaintiffs challenged the Virginia transfer of assets rule that disqualifies AFDC applicants who improperly dispose of property without adequate compensation for the purpose of becoming eligible for benefits. 862 F.2d at 1082. First, they claimed that the rule conflicted with the statute's requirement that the states shall, in determining need, take into account any income and resources of any persons claiming aid. *Id.* at 1085. Second, they claimed that the state rule also conflicted with the federal regulation that required states to consider income available for current use in determining eligibility. *Id.* at 1082. Finally, they challenged the Virginia rule as contrary to the judicially imposed availability principle that prevents states from denying benefits based upon income imputed to an applicant even though the income is not really available. Nevertheless, the plaintiff's challenge to the state rules failed.

■ Similarly, in the instant case, the plaintiffs look to the statute, the regulations, and case law to challenge the state's position. A threshold matter, however, is determining exactly which state action the plaintiffs challenge. They do not challenge the 1974 groupings or Stafford County's initial placement in Group I. They also claim that they do not challenge the standards of need and concede that each state

---

4. The United States Department of Health, Education, and Welfare was redesignated the United States Department of Health and Human Services. 20 U.S.C. 3508(b).

5. Another example includes Part IV § 3131.1 of the Handbook of Public Assistance Administration, which provides:

The State Plan must include the State-wide standard and the policies to be applied uniformly throughout the state in the determination of need and the amount of assistance. In order that the standard and the policies may be uniformly applied and thus provide a basis for objective and equitable determinations throughout the state, it is essential that the instructions be clear and definite ...

is free to set its own standard of need.[6] Instead, they challenge the state's continued treatment of Stafford County as a Group I locality, despite evidence suggesting that Stafford County's present cost-of-living is equivalent to or greater than Group III areas. In essence, plaintiffs challenge the state's maintenance of the original groupings and the multiple refusals by both the General Assembly and the DSS to make either general or specific changes to the groupings.

While this continued plan is neither a state rule nor state initiative in the traditional sense, the Court is convinced that in light of the Congress' grant of power to the states in this area, the same level of deference must be given to the states' decisions. The defendant's actions pass the *Deel* test because neither the statute nor the regulations reveal a clear Congressional intent to forbid a state from maintaining its original plan. In fact, Congressional intent supports the states' exercise of discretion.

First, the statute itself does not clearly require states to make adjustments to account for changes in the costs-of-living. *See* 42 U.S.C. § 602(a). Instead, the statute speaks generally of a state agency maintaining a statewide system to eliminate arbitrary differences in operating procedures and in welfare payments between areas in the same state. Social Security Board, Social Security in America, A Summary of Staff Reports of the Committee on Economic Security, 161, 191 (1971).

Second, the regulations, although more specific, also speak in fairly general terms of equitable treatment and uniformity. The Supreme Court recently invalidated a state law because it conflicted with one of these provisions that forbids exclusion of

individuals or groups on an arbitrary or unreasonable basis. *See Blum*, 457 U.S. at 145, 102 S.Ct. at 2363. The New York law that was challenged in *Blum* excluded AFDC recipients from eligibility for Emergency Assistance Funds. The instant case, however, is different for several reasons. In *Blum*, the Court relied heavily on the Secretary of Health Education and Welfare's specific requirement that state Emergency Assistance Plans include AFDC recipients. *Id.* at 140, 102 S.Ct. at 2360. There is no agency rule, however, that requires states to reevaluate the standards of need. HHS aspires to uniformity, but recognizes that there is no ongoing requirement:

> There are no statutory or regulatory requirements which *require* States to periodically rejustify the area differentials. However, the State should ensure that the basis for setting the different benefit standards remains valid and adjust them, when appropriate. . . .

Linda McMahon, Associate Commissioner for Family Assistance, Letter to Martha McSteen, Regional Commissioner SSA (January 5, 1983) (emphasis in original). The *Blum* case is also different because in *Blum*, the Secretary of HHS also explicitly disapproved of New York's plan. *Id.* at 141, 102 S.Ct. at 23. The Secretary has not specifically disapproved of Virginia's plan; on the contrary, the Secretary recently advised the defendant that the Virginia plan complied with federal regulations. The Secretary's approval commands substantial deference and "is entitled to the 'considerable weight [that] should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer.' " *Deel*, 862 F.2d at 1087, quoting *Chevron U.S.A., Inc. v. Natural Re-*

---

6. *King v. Smith*, 392 U.S. 309, 318, 88 S.Ct. 2128, 2133, 20 L.Ed.2d 1118 (1967). Part IV § 607 of the Handbook of Public Assistance Administration provides that "the standard [of need] must be defined by each State. . . . [T]he standard so defined depends upon the conditions existing in each State." The legislative history also recognizes that States have power to determine who is needy and that the States are free to impose eligibility requirements. H.R.Rep. No. 615, 74th Cong., 1st Sess., 24 (1935).

Defendants maintain that plaintiffs are simply challenging the standard of need. Defendant stresses that placement in a grouping only affects the standard of need; if Stafford was moved into Group III, the only thing that would change is its standard of need. This conclusion, however, ignores the gist of the plaintiff's challenge which goes not to the level of the standard of need, but rather to the discrepancy between Stafford's level of need and that of other similarly situated counties.

*sources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Thus, while the New York statute in *Blum* conflicted with the federal agency's requirements and failed to gain the Secretary's approval, Virginia's plan is not in direct conflict with an agency rule or interpretation.

Although the statute and regulations speak in general terms, on two occasions Congress has addressed the states' duty to update standards of need and has rejected such a requirement. In 1967, the Administration introduced legislation to amend the social security laws to require states to revise and update their standards of need on an annual basis to account for changes in the cost-of-living. As proposed, the following would have been added to § 402(a) of the Social Security Act:

> (14)(B) effective July 1, 1968, for an annual review of such standards and (to the extent prescribed by the Secretary) for updating such standards to take into account changes in living costs.

Section 202(b) of the Administration Bill, H.R. 5710, 90th Cong., 1st Sess. (1967). This provision, however, was not included in the ultimate bill reported by the House, Ways, and Means Committee. *See* H.R. 12080, 90th Cong., 1st Sess. The Senate version, which required states to adjust the standards annually, was eliminated in the Conference Committee. S.Rep. No. 744, 90th Cong., 1st Sess., 169–170 (1967) U.S. Code Cong. & Admin.News 1967, p. 2834. Instead, § 402(a)(23) was enacted which provides:

> [The States shall] provide that by July 1, 1969, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted.

42 U.S.C. § 402(a)(23). Thus, in 1967, Congress rejected any requirement of periodic review and instead required just one adjustment before July 1, 1969.

In 1988, Congress again considered mandatory increases in state standards of need and benefit levels. *See* Family Support Act of 1988, Pub.L. No. 100–485, 102 Stat. 2343. After considerable debate, Congress deliberately rejected any mandatory adjustments in the state standards of need and benefit levels. Instead, Congress required states to reevaluate its standard of need every three years, and report the reevaluation to the Secretary of HHS. *Id.* at 2398.

Congress thus has decided twice not to compel periodic increases to reflect increases in the cost of living. Instead, it has left the states' discretion intact in this area of determining benefits.

Similar to the statute, regulations, and legislative history, case law also fails to support plaintiffs' position. Nevertheless, in support of the proposition that the states have an ongoing duty to ensure that area differentials are based on equitable criteria, plaintiffs rely on cases arising from New York's original plan of area differentials. *See Rothstein v. Wyman,* 303 F.Supp. 339 (S.D.N.Y.1969), *vacated* 398 U.S. 275, 90 S.Ct. 1582, 26 L.Ed.2d 218 (1970), 336 F.Supp. 328 (S.D.N.Y.1970), *rev'd* 467 F.2d 226 (2d Cir.1972) (on relief question only), *cert. denied* 411 U.S. 921, 93 S.Ct. 1552, 36 L.Ed.2d 315 (1973) and *Boddie v. Wyman,* 323 F.Supp. 1189 (N.D. N.Y.1970) *aff'd,* 434 F.2d 1207 (2d Cir. 1970), *aff'd,* 402 U.S. 991, 91 S.Ct. 2168, 29 L.Ed.2d 157 (1971).

The *Rothstein* plaintiffs, AFDC recipients living in counties surrounding New York City, challenged a state regulation which gave New York City welfare recipients higher benefits than recipients in the remainder of the state. 303 F.Supp. 339. This plan was based on cost data that had grouped the surrounding counties with New York City. 303 F.Supp. at 342–343. The District Court eventually decreed that the plan constituted a violation of the uniformity requirements of the Social Security Act. 336 F.Supp. 328.

The *Boddie* plaintiffs challenged the lower welfare payments made in all areas of New York state outside of New York City. 323 F.Supp. at 1191. The Second Circuit,

affirmed by the Supreme Court, held that the plan violated the uniformity requirements of the Social Security Act because the plan could not be justified by objectively established cost differentials. 434 F.2d at 1208.

While the *Boddie* and *Rothstein* decisions address uniformity requirements, the cases do not resolve the instant issue. Both *Boddie* and *Rothstein* challenge initial plans of area differentials that were clearly not based on objective criteria. The cases do not impose an ongoing duty to update the area differentials and accompanying standards of need.

The Stafford County plaintiffs, however, do not claim that Virginia's plan is not based on objective verifiable evidence. They admit that the area differentials should be based on the standard of need and that the factors composing the standard of need, such as housing, food, and medical care are valid. They do challenge the state's response to the changing nature of each individual factor comprising the standard of need. The *Boddie* and *Rothstein* decisions, however, require the validity in the initial structure of a state plan, not the accommodation of changes in the individual factors comprising the standard of need.

Based upon the plaintiffs' evidence and the defendant's own studies and recommendations, this Court is satisfied that Stafford County could not be placed in Group I if a regrouping were to take place now. Nevertheless, having been legally classified in 1974, Stafford County cannot look to the statutes, regulations, or case law for relief. The state is under no statutory obligation to update the groupings.

Because the plaintiffs do not prevail on the statutory claims, this Court must address plaintiffs' Constitutional claim that Stafford County's placement in Group I denies the plaintiffs equal protection of the laws because of the disparate treatment they receive in comparison to others similarly situated. They reason that Stafford County residents face equivalent or greater costs-of-living than those residents in Group III localities who receive higher benefits.

The teachings of the Supreme Court are such that if Virginia's classification has some reasonable basis, it does not violate the Equal Protection Clause merely because the classifications are imperfect. *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1969). "It is enough that the State's action be rationally based and free from invidious discrimination." *Id.* at 487, 90 S.Ct. at 1162.

Defendant submits that with its limited pool of money, it cannot satisfy the fifty-one localities that may need to be shifted into a higher group. This conflict, coupled with other economic, social, and philosophical problems presented by the welfare assistance programs, has given the state the choice of eliminating optional policies, instituting a ratable reduction, moving fifty-one localities into different groups, or maintaining the status quo. The state has chosen to maintain the status quo rather than reduce AFDC benefits for all recipients. This choice has the reasonable and identified governmental objective of balancing the above conflicting goals with a limited pool of resources. The Court is of the view that it passes Equal Protection muster. *See Schweiker v. Wilson*, 450 U.S. 221, 225, 101 S.Ct. 1074, 1078, 67 L.Ed.2d 186 (1980); *Dandridge*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

As defendant points out, there is an inherent inequality in dividing welfare benefits. For example, the Supreme Court has recognized that even the single statewide standard of need based upon averaging results in inequalities between those faced with higher costs-of-living and those with lower costs-of-living. "[O]bviously such averaging may affect some families adversely and benefit others." *Rosado v. Wyman*, 397 U.S. 397, 419, 90 S.Ct. 1207, 1221, 25 L.Ed.2d 442 (1970). In this case, the state sought to minimize inequalities by initially establishing the area differentials. Differences that have developed subsequently do not put defendant in violation of the Equal Protection Clause.

### III. *Conclusion*

In sum, this Court finds that Stafford County's initial placement in Group I was

valid in 1974. Despite subsequent drastic changes in the cost-of-living in Stafford County, neither the statute nor regulations require defendant to take these changes into account. Further, plaintiffs' Equal Protection claim fails in light of the state's rationally based decision to maintain the status quo as a compromise among many competing goals.

While not unsympathetic to plaintiffs' plight, the Court is satisfied that the remedy, if any, is a matter which is beyond the Court's powers. Plaintiffs' relief must come from an appropriate legislative body.

An appropriate Order shall issue.

### ORDER

For the reasons stated in the accompanying Memorandum, and deeming it proper so to do, it is ADJUDGED and ORDERED that defendant's motion for summary judgment be and the same is GRANTED, and he stands dismissed with his costs.

It is further ORDERED that plaintiffs' motion for summary judgment be and the same is DENIED.

This case is to be filed among the ended causes.