John O'REILLY et al., Plaintiffs,

v.

George K. WYMAN, in his capacity as Commissioner of the New York State Department of Social Services and the New York State Department of Social Services, Defendants.

No. 69–Civ.–2780.

United States District Court
S. D. New York.

Sept. 22, 1969.

Robert P. Borsody and Lee A. Albert, New York City (Center on Social Welfare Policy and Law, New York, N. Y., Harold Edgar, New York City, of counsel), for plaintiffs.

Mark T. Walsh, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen., of the State of New York, Albany, N. Y., Steven M. Hochberg, Deputy Asst. Atty. Gen., New York City, of counsel), for defendants.

Before MOORE, Circuit Judge, and BONSAL and MOTLEY, District Judges.

MOORE, Circuit Judge.

The complaint attacks the constitutionality of an amendment to the New York Social Services Law, section 367-a (4)[1], effective July 1, 1969 and seeks a

---

1. Section 367-a(4) of the New York Social Services Law provides as follows:

AN ACT

To amend the social services law, in relation to the amount payable by social services districts for out-patient care under the provisions of title eleven of such law.

The People of the State of New York, represented in Senate and Assembly, do enact as follows:

Section 1. Subdivision four of section three hundred sixty-seven-a of the social services law, as added by a chapter of the laws of nineteen hundred sixty-

nine, entitled "An act to amend the social services law, in relation to establishing co-insurance for out-patient care in medical assistance", is hereby amended to read as follows:

4. [No] A social services district shall pay [more than] *only* eighty per cent of the cost of medical care and services available under this title, other than inpatient care and services in a medical institution, with respect to any applicant or recipient whose eligibility is derived from subparagraph four of paragraph (a) of subdivision one of section three hundred sixty-six of this

declaration of its invalidity and an injunction against its enforcement.

Prior to July 1, 1969 plaintiffs, by order to show cause based upon the complaint and certain affidavits, sought the convocation of a three-judge court "for the purpose of hearing and determining an application for a preliminary injunction."

On July 2, 1969, after hearing testimony and oral argument and reading plaintiffs' brief in support of their motion for a temporary restraining order, Judge Motley granted the order restraining the defendants from putting into effect section 367-a(4) and requested the convocation of a three-judge court. This court was accordingly designated. In view of the restraining order still in effect, no action has been taken under section 367-a(4) nor experience gained as to the factual consequences of its operation.

*The Amendment, Section 367-a(4)*

Before the amendment was enacted, all persons receiving out-patient care, who qualified as medically indigent, were entitled to free medical care, services and supplies, namely, 100% of such charges were paid for by the State. By virtue of the amendment, two income categories were established, the amounts depending on the number in the family, (1) public assistance level and (2) a level higher than public assistance, but which qualifies a person for medical benefits as medically indigent. For those persons (the medically indigent who are not on welfare) the State by the amendment provided for 100% of hospital care but only 80% of out-patient care, the patient being required to pay the remaining 20%. The amendment is referred to as the co-insurance amendment.

To ascertain eligibility in these categories certain administrative procedures and factual investigations are necessary. It is these administrative details, primarily the determination of medical indigency on an annual basis and the alleged 30-day period for determining whether a patient is entitled to 100% out-patient coverage, which plaintiffs attack as potentially creating constitutional and/or statutory defects in the amendment.

*Jurisdiction*

█ First, the fundamental question of jurisdiction must be resolved. The defendant New York State Department of Social Services is not a "person" within the meaning of Section 1983 of 42 U.S.C. and there is no jurisdiction as to this Department. Rosado, etc. v. Wyman, etc., 414 F.2d 170, 2 Cir., decided July 16, 1969, and cases cited therein. Although Judge Hays in *Rosado* believed that the attack on a State statute was, or should be, against the State and that, because the suit was not based on action taken by the Commissioner under the statute, the Commissioner as an individual was not within the scope of Section 1983, here the plaintiffs assert threatened action under the statute by the Commissioner. Furthermore, in *Rosado* Chief Judge Lumbard was of the view that the district court "did have pendent jurisdiction over the statutory claim in the sense of judicial power.", 414 F.2d, at p. 180 but indicated that "the three-judge court might well have dismissed the pendent claim" and that "from the standpoint of judicial convenience and economy" the three-judge

title; provided, however, that the above limitation shall not apply with respect to any such applicant or recipient whose expenditures *and obligations for* [such] medical care and services have reduced such person's income and resources to [the level of eligibility for public assistance] *an amount equal to the most*

*liberal money payment standard used by this state, at any time on and after January first, nineteen hundred sixty-six, as a measure of financial eligibility in any categorical money payment program.*
§ 2. This act shall take effect July first, nineteen hundred sixty-nine.

court could have disposed of the claims before it. 414 F.2d, at p. 181.

■ Accordingly, we assume jurisdiction over the Commissioner for the limited purpose of resolving the only question currently before us, namely, the granting or the denial of a preliminary injunction. Do these facts presently before us disclose such a clear and present danger of illegal action about to be taken as to justify the granting of the extraordinary relief of restraining enforcement of a law enacted by the State Legislature pursuant to its powers to legislate with respect to the State's welfare program? Since the law has not as yet been applied because of the restraining order, plaintiffs are forced to base their fears of violation upon the way they believe Section 367-a(4) "will be administered." Such anticipated (in their opinion) administration "violates the requirements of Title XIX of the Social Security Act, 42 U.S.C.A. § 1396a et seq. (Supp. 1969)" (GRANTS TO STATES FOR MEDICAL ASSISTANCE PROGRAMS) which requires the State to "have submitted, and had approved by the Secretary of Health, Education, and Welfare, State plans for medical assistance." Section 1396. Comprehensive details as to what the State plans must provide are set forth in sections 1396a through 1396f.

"[I]t is not the wisdom of the law that * * * [the plaintiffs] here challenge. Rather [they claim] the law, as construed by the State administrators, is in conflict with the federal requirement that subsistence income is to be saved for the necessities of life—food and shelter—and not to be used for medical payments." Plaintiffs further narrow the issue by conceding that "On its face, the co-insurance amendment conforms to the federal requirement that an individual may not be required to pay the 20% co-insurance fee where to do so would require him to 'spend down' below the public assistance level * * *". Their complaint is that "the computation of available excess income

for co-insurance purposes * * * will be made on an *annual* basis." (Pltfs' Memo. p. 17). Thus, they say, "The length of time over which income is deemed available under the New York co-insurance requirement clearly violates federal law." They cite a federal regulation, which relates to subsistence level income and refers to reasonable evaluation of income and resources (34 Fed. Reg. 1321, Chapter II, 45 C.F.R. § 248.21(4) as being "preferably of not more than 3 months, but not in excess of 6 months, ahead * * *"). Using this provision, providing for initial eligibility for medical assistance, plaintiffs argue that "As an absolute maximum, only six months' income can be deemed available, and it is preferred that only three months' income be considered." In addition plaintiffs invoke New York's requirements for determining income for Medicaid applicants namely, "only the excess income for the month or months in which care or services are given shall be considered as available for payment." (18 NYCRR § 85.4(e) (iii)).

Plaintiffs cite no statute or regulation which requires that "available income" for co-insurance be determined on an annual basis. There is testimony of Albert F. Moncure, who is asserted to be in charge of implementing the new amendments, which tends to support the inference that an annual calculation may be used. (Tr. p. 104–06). But his testimony is vague and inconclusive and does not state explicitly that "available income" to pay specific medical bills incurred in a particular month is to be calculated on a yearly basis. He affirms only that one must co-insure until "excess" income is used up. No reference is made to borderline cases on which the plaintiffs so heavily rely.

Also vague and inconclusive on yearly determination is Exhibit 1, a letter from defendant Wyman to the Commissioners of Social Services, which states " * * * persons are subject to cost sharing until their income is reduced to a public assistance level."

In short, we have been shown no *requirement,* either statutory or regulatory, that "available income" for co-insurance must be determined on a yearly basis, as opposed to a shorter period. Moreover, if the State improperly determines "available income", or threatens to do so, which has not been proven to us, presumably there are adequate administrative or State remedies which are available. The medical assistance program challenged here is a State program, which is not yet in its incipiency, and recourse should not be made to federal courts when such problems as may arise can be more easily and more quickly corrected in the agency itself.

In aid of their argument plaintiffs assume several hypothetical situations. Illustrative are:

(1) A family of four has a yearly income of $4,090. The applicable public assistance level is $3,790, leaving an excess of $300 which must be spent on medical payments before the 20% co-insurance requirement is waived. Plaintiffs reduce this $4,090 income to $340 a month and the welfare income to some $316 a month, a differential of $24. They then assume a medical bill of $200 in a month as not unlikely. Again on the assumption that the patient will be forced to pay 20% of $200, namely, $40 within the one-month period, they reach a loss of $16 ($40 paid less $24 excess) which they assert "represents disaster to him."

(2) If the welfare level is $3,000 and a person has an income of $3,005 then only $5 is available for medical expenses.

(3) A person earns $4,000 a year, or $77 a week, $333 a month, $2,000 in six months and is assumed to have a medical bill of $400. This bill would exhaust his $77 and leave him with a debt of $323.

The Legislature has decided that completely free medical aid should not be given to the medically indigent as above defined but rather that since they are above welfare levels they should contribute 20% to the cost of out-patient care. Such action has been specifically allowed by Congress. S.S.A. § 1902(a) (14); 42 U.S.C.A. § 1396a(a) (14). (Supp.1969). By taking certain suppositious cases plaintiffs contend that the persons therein involved would be driven below the public assistance level. This consequence, in turn, they say, offends the Social Security principle that "No recipient of medical assistance may be required in any circumstances, to pay co-insurance when his 'available' income is at or below the public assistance level." (Pltfs' Memo. p. 11). Section 1902(a) (14), amongst other matters, provides that cost sharing (co-insurance) "shall be reasonably related (as determined in accordance with standards approved by the Secretary and included in the plan) to the recipient's income or his income and resources;". The problem—who is to determine what is "reasonably related"—is resolved by the section itself; it is by the Secretary who is to approve the standards for determination. The method of calculating the recipient's income is not specified. The only prohibition is against any cost sharing which "would reduce the individual's income below the most liberal money payment standard used by the State, at any time on or after January 1, 1969, as a measure of financial eligibility in any categorical money payment program in the State." Reg. H.E.W.; 45 C.F.R. § 248.21(a) (1) (ii).

▮ Of course, fact assumptions can be made of large medical bills and small incomes with a resultant mathematical deficit. But injunctions must be based upon existing or actually threatened real situations and not on far-fetched hypotheses. Who, for example, would meet, or be expected to meet, a $400 medical bill, in the week in which it was received, out of an income of $77?

In addition to complaining of the method which the State has proposed for determining income, plaintiffs object to any investigation period to enable the State to check the applicants' right to change their status from 80% to 100%. Thus they contend that "There is no

reason whatever for the State not to grant 100% medical assistance immediately on the basis of a declaration of a recipient who has already been determined to be eligible for some Medicaid assistance that he has spent down to public assistance floor" (Pltfs' Memo. p. 28). During this indicated 30-day investigatory period, plaintiffs assert that those who pay their 20% in cash will not be reimbursed whereas those who receive credit from their providers will be paid if they are entitled thereto.

Additionally, using many hypothetical situations all calculated to change medically indigent cases to those below a public assistance level, plaintiffs endeavor to find a constitutional defect in the amendment because (they assert):

A. The one-year period of measuring income when one month is used for other determinations (which they claim are comparable) is a denial of equal protection;

B. The difference in treatment of those who pay their 20% in cash as distinguished from those who receive credit creates an unreasonable classification which denies equal protection; and

C. Refusal to reimburse is a deprivation of property without due process of law.

As noted previously, there is inadequate proof that the State will make its determinations on a yearly basis. Furthermore, whenever classifications are established by law, there are bound to be borderline cases. The legislature, supposedly representing the will of the people, has decreed that certain benefits be given to certain groups depending upon their annual salaries. Within the groups, the law applies equally. Individual borderline situations may require a change in category. But this does not create constitutional infirmity.

The same is true of the investigatory period. The period might have been 5 days, 15 days or 60 days. But this was a legislative decision and can scarcely be characterized as unreasonable, arbitrary or discriminatory.

In final analysis, plaintiffs ask this court to substitute its judgment (and theirs) for that of the Legislature. This would be tantamount to the assumption by the judiciary of the legislative function.

As an *in terrorem* argument, plaintiffs assert that the burdens imposed upon the medical profession because of the necessity of preparing two bills, one for 80%, one for 20%, will cause doctors and other providers to refuse to treat patients. Absent proof the court will not assume that the doctors of this State will be so faithless to the Hippocratic oath nor that a doctor would not grant credit for the 20% in needy cases. The affidavits of a dentist and a chiropractor that they could not be expected to treat a patient not paying the 20% in cash, the affidavits of the director of a health center and of the acting Commissioner of New York hospitals which predict that the quality of their services will be lowered because of the amendment are not to be awarded the dignity of proof. Not a single affidavit or statement has been produced from any doctor of medicine that he would refuse to treat an indigent patient who was unable to place a 20% payment in cash in his hand before he deigned to diagnose and prescribe.

There remains only for consideration the solution of this particular case. Two of the fundamental guides are (1) the nature, extent and quality of proof and (2) the ultimate likelihood of success. The recent decision by this court in *Rosado* is not without significance. In that case Judge Hays believed that an injunction was inappropriate because "the practical effect of an injunction is to order the New York legislature to appropriate more funds for welfare." (414 F.2d, at p. 176). So would it be here.

Chief Judge Lumbard did "not feel that the federal courts are the appropriate forum for the initial resolution of plaintiffs' statutory claim," (414 F.2d, at p. 181). He was of the opinion that "the federal claim seems more apt for initial resolution by the Department of

Health, Education and Welfare, than by the courts." (p. 181); and that H.E.W. "with its expertise in the operation of the A.F.D.C. [*Aid to Families with Dependent Children*] program and its experience in reviewing the very technical provisions of state welfare laws," should have "an initial opportunity to consider whether or not § 131-a is in compliance with § 602(a) (23) [change in welfare payments statutes]" (p. 181). Here, likewise, there has been no such determination, and the statutory claim is "more apt for initial resolution" by the Secretary of Health, Education and Welfare.

In dealing with ever-changing social problems, the courts should not blind themselves to current events. Changes of moment in the welfare fields may well be made in the near future—witness the President's address to the nation on August 8, 1969. The H.E.W. itself is considering New York's legislation. The State administrative officials have not as yet had an opportunity to act under the amendment or to react to specific cases.

Under all applicable standards, it is clear that a preliminary injunction should be denied and the temporary restraining order dissolved. However, since there are these unresolved factual matters, it seems best to abstain at this time from passing upon the merits with finality but rather to retain jurisdiction so that upon a trial facts may be developed upon which the court may have a better foundation for a determination of the issues than are now before it.

Preliminary injunction denied; temporary restraining order dissolved.

MOTLEY, District Judge (dissenting).

Plaintiffs in this class action are the "medically indigent" of New York. The "medically indigent" are persons who:

"(a) meet the categorical requirements for federally supported welfare, being blind, disabled, 65 years old, or dependent children;

(b) have income higher than the public assistance levels set under the state plans; and

(c) have insufficient income and resources to meet the costs of necessary medical services." [1]

Prior to the recent Co-Insurance Amendment, scheduled to become effective on July 1, 1969, New York had paid 100% of all the medical expenses, both in-patient and out-patient, incurred by this class. By the terms of the Amendment, however, the "medically indigent" must now contribute 20% of the cost of their out-patient medical care, the State paying the remainder.

Plaintiffs challenge neither the propriety nor the wisdom of the requirement of contribution, itself, as a means of economizing on New York State Medicaid expenditures. Rather, they point to constitutional infirmities, as well as direct conflicts with federal statutes and administrative regulations, in the proposed manner of implementing the Amendment by the defendants Commissioner and Department of Social Services. They claim that the proposed operation of co-insurance will deny them the equal protection of the laws of the State of New York in violation of the Fourteenth Amendment; and that it is also antithetical to the command and intent of the Social Security Act and regulations adopted thereunder by the Department of Health, Education and Welfare.

*Jurisdiction*

Federal court jurisdiction is here founded on the substantive rights created by 42 U.S.C. § 1983, and the implementation of those rights in the federal courts by 28 U.S.C. § 1343. [2] Specifically, this suit is brought

1. Plaintiffs' Memorandum, p. 9.

2. In *King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), the Court noted that the welfare beneficiaries in that case had predicated their class action on 42 U.S.C. § 1983. In *King*, the Court held Alabama's "substitute father" regu-

"[t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States * * *." 28 U.S.C. § 1343(3).

Having been properly brought initially in this court, a statutory three-judge court was properly convened to decide this case for two reasons. First, it is now clear that the "redress" sought by plaintiffs is an injunction enjoining state-wide regulations promulgated by Commissioner Wyman [Plaintiffs' Exhibit 1] in enforcement of the Co-Insurance Amendment. Hence, they are state statutes within the meaning of 28 U.S.C. § 2281. King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). Second, the constitutional right allegedly withheld is the right not to be denied the equal protection of the laws of the State of New York. Rothstein v. Wyman, 303 F.Supp. 339 (S.D.N.Y.1969) (decided 8/4/69). And as this judge initially ruled, plaintiffs' complaint raises a substantial constitutional question as to whether plaintiffs will be denied the equal protection of the laws by the proposed operation of the Amendment. Memorandum Decision and Order, 7/3/69.

As the majority correctly holds, a three-judge statutory court not only has the power to decide the constitutional issue but also the power, in the jurisdictional sense, to decide the pendent statutory claims of plaintiffs (an issue which will be considered at greater length below).

However, it is the opinion of this judge that the majority erred in finding that "defendant New York State Department of Social Services is not a 'person' within the meaning of Section 1983 of 42 U.S.C. and there is no juris-

diction as to this Department." This proposition, if sound, is one of fundamental importance to all litigants contesting the constitutionality of state statutes and administrative regulations in the federal courts. For it would preclude an effective "one-shot" remedy of injunctive relief against purportedly unconstitutional conduct on the part of state officials and subordinates of state agencies. If, for example, an injunction were to issue against defendant Wyman, alone, prohibited conduct on the part of other members of the Department might have to be separately enjoined in countless lawsuits or contempt proceedings. Particularly in the area of welfare and medical assistance, such a spectacle would be as ironic as it would be devastating. Thus, it is important to treat the contention of the majority with great care.

Authority for the proposition that the Department is not a "person" within the meaning of 42 U.S.C. § 1983 is said to be found in Judge Hays's opinion in Rosado v. Wyman,[3] "and cases cited therein." Judge Hays, in turn, rested his conclusion as to lack of "personality" upon Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and two 9th Circuit cases following: Clark v. Washington, 366 F.2d 678 (9th Cir. 1966); Williford v. California, 352 F.2d 474 (9th Cir. 1965).

Monroe dealt with the question of whether, under § 1983, the City of Chicago could be held liable in damages for the brutality of certain of its police officers. The Court, deeply impressed by the history of Congressional concern over the spectre of political subdivisions of the state having "to pay full compensation"[4] to those injured by violations of the Civil Rights Act, as well as by the House of Representatives' belief that "Congress had no constitutional power to impose any obligation upon county and

---

lation which denied benefits to dependent children if their mothers cohabited with a man, violative of the Social Security Act of 1935.

3. 414 F.2d 170 (2d Cir. July 16, 1969). This, although it announced the Court's

decision, was not its unanimous opinion. Chief Judge Lumbard concurred separately, and Judge Feinberg dissented.

4. 365 U.S. 188, 81 S.Ct. 473, citing Cong. Globe, 42d Cong., 1st Sess., p. 663.

town organizations, the mere instrumentality for the administration of state law,"[5] *held,* that a municipal corporation is not a "person" within the meaning of § 1983.[6]

*Monroe* turned, then, on a strictly limited construction of "person", governed by the particular and heated Congressional debate concerning municipal liability when the original Civil Rights Act was being considered. The Court was largely prompted to hold as it did because the question of monetary damages was in issue. True, it felt itself forced to decide that municipal corporations were not "persons" for the purpose of granting equitable relief against them as well, 365 U.S. 191–192, 81 S.Ct. 473, ftn 50, but it expressly did not "reach the constitutional question whether Congress has the power to make municipalities liable for acts of its officers that violate the civil rights of individuals." 365 U.S. 191, 81 S.Ct., at p. 486. Therefore, *Monroe* should not be read as the latest commentary on Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1907), and the question of state sovereign immunity. *Monroe* found that cities were not subject to suit under § 1983 but did not say a word about their suability because they were part of the "state", and hence protected from suit by the Eleventh Amendment.

In sum, *Monroe* should not be read broadly as a bar against suits involving "agencies" or "arms" of the state in the federal courts. Unfortunately, its precisely delineated rationale has been confused with sovereign immunity in the 9th Circuit cases also cited by Judge Hays in *Rosado.*

In Williford v. California, *supra,* the court purported to apply the rule in *Monroe* to hold that the State of California was not amenable to suit under the Civil Rights Act. "A municipal corporation is but a political subdivision of a state, and if a state's political subdivisions are not "persons" under the statute, then neither is the state." 352 F.2d 474, 476. But, of course, the considerations that led the Court in *Monroe* to go down the scale of government and reach one result, do not so neatly apply going up. At any event, *Williford* does not add any learning to the problem of whether the Department of Social Services, clearly *not* a "political subdivision of the State," is a "person" within the meaning of § 1983.

In Clark v. State of Washington, *supra, Monroe* was not even discussed in the holding that "[a] state is not a 'person' within the meaning of [42 U.S.C. § 1983] * * *, and this must likewise be true of the Bar Association, which is an agency of the state." 366 F.2d 678, 681. Again, the compelling logic before the conclusion is not self-evident, and there is no discussion as to why an agent "must" be treated exactly like the principal.

However, *Clark* is at least more apposite to a determination of the status of the Department, which is arguably an agent of the state. It, like the Bar Association in *Clark,* is an administrative body entrusted with regulating statewide practices. If analogies are to be drawn, however, the Department would seem more akin to a state board of education than a bar association, because of the latter's peculiar relationship to the law and the judiciary. On the other hand, a board of education is as much concerned with the general public welfare as is the Department of Social Services.

In an iron-link chain of precedent in the 5th Circuit, the State Board of Education of Louisiana has been held amenable to suit in school segregation cases, even as an "agent" of the state, under § 1983.

"For the second time in this case and for the seventh time in recent years, we hold that a state agency is not immune from a suit to enjoin it from enforcing an unconstitutional statute, and the individual members of the

---

5. 365 U.S. 190, 81 S.Ct., at p. 485, citing Id., p. 804.

6. 365 U.S. 192, 81 S.Ct. 473.

state board need not be joined as party defendant. Again we repeat that the State cannot by statute or constitution make the State Board of Education a 'special agency' free from suits to enjoin the board's actions in violation of federally guaranteed rights. McCoy v. Louisiana State Board of Education, 5 Cir. 1964, 332 F.2d 915; Louisiana State Board of Education v. Baker, 5 Cir. 1964, 339 F.2d 911." McCoy v. Louisiana State Bd. of Ed., 345 F.2d 720, (5th Cir. 1965).

For cases prior to *Monroe*, whose reasoning is believed to remain intact, see Orleans Parish School Bd. v. Bush, 242 F.2d 156 (5 Cir. 1957); Dorsey v. State Athletic Commission, 168 F.Supp. 149 (D.C.1958).

In all these cases, the court was responding directly to claims that the issue at stake was one of sovereign immunity, that the School Board was in fact the "State" and thus not suable by virtue of the operation of the Eleventh Amendment. Thus, these cases did not specifically decide that the School Board was a "person" within § 1983. However, they were all decided after *Monroe* (save for *Dorsey* and *Orleans Parish*); and if the issue was neither raised nor discussed, it is a fair inference that the court found it to be irrelevant. At any event, the *McCoy* cases stand for the proposition that a state agency is not insulated from attack under § 1983, squarely contrary to *Clark, supra.*[7]

Thus, the situation in the Circuits appears to be a confused one at best. However, reliance need not be placed on decisions elsewhere to dispute the claim that the Department is not a "person". In the recent welfare case of Rothstein v. Wyman and Department of Social Services for the State of New York, *supra,* injunctive relief was granted against the Department *as defendant in its own right.* Judge Mansfield, writing for a unanimous panel of three judges, repeatedly referred to the "defendants" and restrained both the Commissioner and the Department from enforcement of the statute there called into question. The Court never doubted —never, in fact, discussed—the propriety of suit against the Department, although jurisdiction was initially founded on § 1983, as it is here.

Judge Hays joined in the opinion of the court. It should be noted that in *Rosado,* itself, Judge Hays was the only judge to expressly question the Department's status as a "person". Judge Feinberg, dissenting, presumably did not doubt the jurisdiction over the Department. Chief Judge Lumbard, concurring, did not consider the applicability of § 1983 to the Department, since he did not believe there was substantive reason to invoke § 1983 against anyone. Thus, the apparent inconsistency in Judge Hays's two decisions would seem best resolved in favor of the finding that the Department *is* a "person" within § 1983. In that event, the Department was properly made a defendant in this case, and if, as I believe, plaintiffs are entitled to preliminary injunctive relief, the Department may be properly enjoined from enforcing the Co-Insurance Amendment as defendants presently propose to enforce it.

### The Constitutional Claims

The constitutional and statutory arguments made by plaintiffs depend on an incredibly complex factual substratum and, unfortunately, a comparatively meager record of briefs, affidavits, and testimony that leaves many crucial questions unanswered. The equal protection claim, for example, hinges on the precise manner in which technical calculations of income are made and acted upon. With this background, it would appear unwise to pass conclusively on the merits of the constitutional issues, especially on this application for preliminary injunctive relief. We might even decline to discuss the constitutional issues alto-

---

7. Presumably because the question was taken to be self-evident, there was no explicit discussion of § 1983 as the basis of jurisdiction.

gether, even though their presence is responsible for the convening of this court. As Chief Judge Lumbard stated in *Rosado*, "Pendent jurisdiction, in the sense of judicial power, attaches at the outset of a suit. See United Mine Workers [of America] v. Gibbs, 383 U.S. 715, 727, 86 S.Ct. 1130 [16 L.Ed.2d 218] (1966). The subsequent dismissal of the constitutional claim, *Gibbs* makes clear, does not deprive the federal courts of all power over a properly joined pendent claim." Rosado v. Wyman, *supra,* 414 F.2d 170, at p. 180. Thus, we might reserve decision on the constitutional claims and proceed to discuss the statutory claims in exercise of pendent jurisdiction.

However, because the majority has generally disparaged but not adequately discussed, the equal protection arguments of plaintiffs, it is necessary to indicate this judge's opinion of plaintiffs' probable success. First it will be necessary to develop the factual morass, such as it is, left largely hidden by the majority.

In my understanding, the Co-Insurance Amendment will operate to create three classes of persons distinguished, in part, by the manner in which their eligibility for Medicaid benefits will be determined. Those three classes are: (1) those who are applying for 100% medical coverage initially because their incomes are al-ready below the public assistance levels; (2) the "medically indigent" who are applying for 100% as opposed to 80% medical coverage because they have, by reason of co-insurance, "spent down" to their particular public assistance level; (3) those who are applying for 80% medical coverage initially because they have become "medically indigent" by virtue of a decrease in income or because they have "spent down" to medical indigence levels from higher income levels.

Commissioner Wyman's Administrative Letter [Plaintiffs' Exhibit # 1], and the testimony of Deputy Commissioner Moncure [Hearing before Motley, J., July 1, 1969, T: 101, 102–5, 107], make it absolutely clear that in determining eligibility for 100% out-patient coverage, as opposed to 80% coverage, the excess income of a member of class (2) which is to be deemed available for co-insurance, *at any given point in time,* is the excess income determined on an annual basis.[8] Therefore, members of class (2) cannot move from 80% to 100% medical coverage until their excess income for the entire year has been exhausted in co-insurance. But, of course, where the annual excess income is very small (in the case of plaintiff Morris it is $10), that which is available as excess income each month is even smaller, so that many people who are

---

8. Plaintiffs' Exhibit 1, denominated "Administrative Letter" dated June 11, 1969, is from the Department of Social Services, and is addressed to "Commissioners of Social Services." It provides in pertinent part as follows:

"This amount ["Maximum Cost to Recipient"] *is the difference between the annual net income of a family household and cash public assistance levels* * * * This is the amount which a family household * * * is required to expend or become obligated to pay on an annual basis for medical care and services * * * before being eligible for 'A' [100%] coverage." (Plaintiffs' Exhibit #1, p. 1) (Emphasis supplied).

\* \* \* \* \* \*

"Exhibit #3 is a suggested sample letter to be used for transmitting identification cards to family households with 'B' [80%] coverage * * * It also explains *that persons are subject to cost sharing until their income is reduced to a public assistance level and when the family has expended or been billed for the difference between the amount shown in the letter and the annual net income, it will become eligible for all medical care and services.*" (Plaintiffs' Exhibit #1, p. 2). (Emphasis supplied).

Such language is not "vague and inconclusive on yearly determination," as the majority has thus characterized Plaintiffs' Exhibit #1. It is precise and blunt on the issue. And the Administrative Letter is a "regulatory" requirement, which is meant to "describe the various changes in forms and procedures which are required as a result of amendments to the Medical Assistance Program effective July 1, 1969." (Plaintiffs' Exhibit #1, p. 1).

"medically indigent" may have monthly incomes of only a dollar or so more than those receiving public assistance. And where the yearly excess may be required to be used up in one month for co-insurance purposes, the income for that month will obviously be at, or even below, the level of public assistance.

As to classes (1) and (3) (original Medicaid applicants), income determination is made on a *monthly* basis. "[O]nly the excess income for the month or months in which care or services are given shall be considered as available for payment." 18 N.Y.C.R.R. § 85.4(e)(iii). Clearly, these classes are treated differently from that class seeking to shift from 80% to 100% medical coverage.

The Supreme Court has ruled that:

" * * * courts must reach and determine the question whether the classifications drawn in a statute are reasonable in light of its purpose."

McLaughlin v. Florida, 379 U.S. 184, 191, 85 S.Ct. 283, 288, 13 L.Ed.2d 222 (1964).

It has also held that:

"The Equal Protection Clause requires more of a state law than non-discriminatory application within the class it establishes."

Rinaldi v. Yeager, 384 U.S. 305, 308, 86 S.Ct. 1497, 1499, 16 L.Ed.2d 577 (1966).

Plaintiffs having shown a patent and important discrimination in the determination of eligibility for Medicaid benefits, the State must now offer a reasonable and acceptable explanation for its action. Moreover, when dealing with fundamental personal interests of great magnitude such as health and physical well being, the State must make that explanation even stronger than usual.

"We believe that with the stakes so high in terms of human misery the equal protection standard to be applied should be stricter than that used upon review of commercial legislation and more nearly approximate that applied to laws affecting fundamental constitutional rights."

Rothstein v. Wyman, *supra*, 303 F. Supp. 339, 347. See also, Hobson v. Hansen, 269 F.Supp. 401, 496–498 (D. D.C.1967, Wright, J.); aff'd sub nom. Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969), appeal dismissed, 393 U.S. 801, 89 S.Ct. 40, 21 L.Ed.2d 85.

The State did offer some justification for the use of the annual income criterion for class (2). Questioned as to the feasibility of using the standard monthly calculation, the representative for the State replied: "I think it is administratively impossible in the State of New York." (Hearing before Motley, J., *supra*, T: 88). However, pressed further on other administrative alternatives, the witness admitted: "I think, at best, cost sharing in this state or coinsurance in this state is going to be utter confusion." (Hearing before Motley, J., *supra*, T: 91). Thus, apparently, *any* form of administration of co-insurance in New York will be difficult; doubtful ease of application seems flimsy ground upon which to defend a grossly discriminatory practice.

Furthermore, it is certain that the defense of "convenience" or saving of time or money in administration of a statute, alone, will not hold up under the battery of a constitutional assault. Rinaldi v. Yeager, 384 U.S. 305, 310, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Thus, until the State can make a convincing argument as to the rationality and necessity of its classification, it would seem that the claim of unconstitutionality with regard to the use of the criterion of one year's income as to class (2) is a good one.

The other equal protection claim has to do with the difference in treatment between those who pay the required 20% of their out-patient care in cash and

those who receive credit for such treatment, while a claim for 100% medical coverage is pending. The argument is that the State will pay the "debts" incurred by the latter but will not "reimburse" the former individual who is out of pocket for the doctor's bills. While the claim is not without merit, there are simply not enough facts concerning New York's policy of "reimbursement" in the record to justify a determination one way or the other at this time. Upon the final hearing of this cause, evidence may well be adduced to vindicate plaintiffs' assertion. No harm is done, however, in reserving judgment on this point, especially in light of my assessment of probable success on the other constitutional claim.

## The Statutory Claims

In its discussion of plaintiffs' statutory claims, the majority takes exception to "several hypothetical situations" which it correctly says plaintiffs assume. Certainly, their brief makes use of illustrative examples to demonstrate more darkly how the conjunction of an annual income determination with a requirement of co-insurance, until excess income is exhausted, will work to compel plaintiffs to utilize subsistence income pending a determination of eligibility for 100% medical coverage. However, plaintiffs' case does not rest on these illustrations. The named plaintiffs are flesh-and-blood "examples" of the predicament sought to be explained. There is nothing in the least "hypothetical" about the plight of Mrs. Rita Morris, Mrs. Lillie Silverman, and Mr. John O'Reilly.

Mrs. Morris has four children and makes $10 more per year than the public assistance income for a family of five. [Plaintiffs' complaint, p. 3; Order to Show Cause, Affidavit of Mrs. Rita Morris]. Mrs. Silverman is 67 years old, lives alone, and receives the grand sum of $54 per year in excess of the public assistance level. [Plaintiffs' complaint, p. 3; Order to Show Cause, Af-

fidavit of Mrs. Lillie Silverman]. And Mr. O'Reilly, who lives on Social Security payments with his welfare-recipient niece, has been "receiving treatment for diabetes, Parkinson's Disease, and a hemorraging [sic] duondenal [sic] ulcer." In addition, he has "appointments at Roosevelt Hospital as an out-patient * * * for treatment of [his] Parkinson's Disease." [Affidavit of Mr. John O'Reilly, p. 1–2].

It would strain the bounds of credulity to believe that Mrs. Morris and her four children would never have medical bills of more than $50 in one month, necessitating their payment of more than $10 in co-insurance and thus dipping into subsistence income for that month. Almost as hard to deny is the likelihood that Mrs. Silverman, who is nearly 70, might have a serious accident or illness costing more than $270 in medical expenses in one month. Most clearly of all, Mr. O'Reilly will have enormous medical expenses because of his terribly serious ailments, and he has definitely scheduled appointments for their treatment in August and September.

Against the unhappy background of these "real" situations, can it be seriously contended that here "fact assumptions * * * [are] made of large medical bills and small incomes with a resultant mathematical deficit?" Is an injunction really being sought based "on far-fetched hypothesis?" It is believed, instead, that the majority simply fails to correctly understand the bitter truth as it exists for Mrs. Morris, Mrs. Silverman, and Mr. O'Reilly. It is believed that this is belied by the majority's unintentionally rhetorical question:

> "Who, for example, would meet, or be expected to meet, a $400 medical bill, in the week in which it was received, out of an income of $77?"

The poor *are* expected to do things that the rest of us are not, not least of which is to continue to live and be healthy on insufficient incomes. The poor *are* required to pay in advance for medical

services; they do not receive "credit" because their bodies are not worth "repossessing" on default. However, differences in the majority's beliefs and mine are not in issue. The record and plaintiffs' affidavits squarely assert that the members of the class will not be able to pay for medical services without dipping into subsistence income. Mr. O'Reilly has sworn that "[i]f [he] [is] required to pay any part of these expenses, [he] will be forced to forego necessary treatment and medication." The defendants have adduced no affidavits or other evidence contradicting this. Therefore, at the very least, any doubt as to the severity and magnitude of plaintiffs' distress ought to be resolved in their favor.

If, in fact, the calculation of available income, the calculation of co-insurance "excess", and the "30-day investigatory period" while a claim for 100% medical coverage is pending, together require the "medically indigent" to "spend down" below public assistance levels, the requirements are flatly in violation of Social Security Act § 1902(a)(14), 42 U.S.C.A. § 1396a(a)(14) (Supp.1969); and of Reg. H.E.W., 34 Fed.Reg. 1320, Part 248, § 248.21(a)(1)(ii). These provisions are set out in pertinent part in the majority opinion but are interpreted to permit violation of monthly subsistence income. This judge believes that, on the contrary, the statute and regulations seem clear on their face to prohibit requiring the expenditure of subsistence income on necessary medical care. See also, supra, 42 U.S.C.A. § 1396a(a)(17)(Supp.1969).

Furthermore, and, perhaps, philosophically most persuasively, the allowing of invasion of monthly subsistence income would make a mockery of the entire Medicaid program in its avowed effort to help needy individuals retain the integrity and self respect so hard to achieve on public assistance. To that end, the

states are directed, in administering Medicaid, to make efforts

"[i]n the direction of broadening the scope of the care and services made available under the plan and in the direction of *liberalizing* the eligibility requirements for medical assistance, with a view towards furnishing by July 1, 1977 comprehensive care and services to substantially all individuals who meet the plan's eligibility standards with respect to income and resources, *including services to enable such individuals to attain or retain independence or self-care.*"

42 U.S.C.A. § 1396b(e)(Supp.1969). Emphasis added.

Thus, one of the chief goals of Medicaid is to prevent people being driven onto public assistance rolls because of illness or poor health. The proposed operation of the Co-Insurance Amendment will not only add to the growing numbers of welfare recipients but will cause many of the co-insurers to live on incomes below that of other welfare recipients.

*Conclusion*

In the words of the majority, "there remains only for consideration the solution of this particular case." Believing, as I do, that plaintiffs have made a substantial showing of probable success on at least one of the constitutional claims and on the statutory claims, and finding that they are threatened with irreparable harm and injury to their health and well being, I believe that defendants should be preliminarily enjoined from enforcing the Co-Insurance Amendment as it is now going to be enforced, pending a final determination on the merits. Even if I were of the opinion that the showing of probable success was less convincing than I have indicated, the comparative harms to plaintiffs and defendants resulting from the granting or withholding of relief, decisively work in favor of the plaintiffs. The usual burden of convincing the court of success at final

hearing is lessened "where the balance of hardships tips decidedly toward the party requesting the temporary relief." Dino DeLaurentiis Cinematografica, S.p.A. v. D–150, Inc., 366 F.2d 373, 375 (2d Cir. 1966) (Emphasis added). See also Checker Motor Corp. v. Chrysler Corp., 405 F.2d 319 (2d Cir. 1969).

Here, not only have plaintiffs shown irreparable harm flowing from operation of the Amendment, but the State has adduced very little harm to its program were it to be enjoined, save some delay and inconvenience. Furthermore, as was brought out in the testimony before the single District Judge (Hearing before Motley, J., *supra*, T: 98–107), alternative means of administering the Amendment could be adopted by the State that would save it from both constitutional and statutory infirmities.

It is not true, in this case, that "the practical effect of an injunction is to order the New York Legislature to appropriate more funds for welfare." Rosado v. Wyman, *supra*, 414 F.2d 170, 180. *Rosado* dealt with a decrease in maximum monthly grants and allowances to all welfare recipients. Here, however, the Legislature has attempted to economize by a scheme of insurance; that is, it is taking a supremely calculated risk that so many persons will require medical care, so many will qualify as co-insurers, so many will have such-and-such a level of income, etc. On the basis of calculations as to *needs*, a sum of money has been allocated. However, if in fact the Legislature has guessed wrongly as to the number of medically needy, or as to the number who will become eligible for 100% Medicaid benefits, it may not refuse aid on the grounds that it will be forced "to appropriate more funds for welfare."

An injunction against enforcement of the present regulations would not preclude New York from administering co-insurance in a constitutionally and stat-utorily acceptable form. And that form would not require money to be spent either on persons not contemplated or within monetary limits not envisaged. If, for example, everyone in New York should unfortunately become eligible for 100% Medicaid coverage, "more money" would certainly have to be provided by the State in an absolute sense. But that is the fault of the stars, not of the judiciary.

*Rosado* is similarly inapposite as regards "the initial resolution of plaintiffs' statutory claims." The Supreme Court has recently decided analogous claims not less complex than the ones before us. King v. Smith, *supra*. See also, Rothstein v. Wyman, *supra*. Plaintiffs rightly point out the inadequacies of the hearing apparatus of the Department of Health, Education and Welfare to give effective redress to private litigants [Plaintiffs' Reply Memorandum, p. 4–5], and further indicate that this Department has, in effect, already "passed" on the conformity of New York's Amendment in an informal manner. Letter of April 18, 1969, from James Callison, Department of Health, Education and Welfare to George K. Wyman.

Finally, this judge cannot agree more fully with the majority's affirmation that "courts in dealing with ever changing social problems should not blind themselves to current events." However, I cannot agree that the President's address of August 8 noticeably has an impact on the case before us. The President spoke primarily of family allowances, not of medical care. At any event, the issue here is not a "political" one—yet—nor is it one to be especially resolved by resort to principles and considerations outside the scope of law and justice. To refuse to act within a clear mandate to do so, in the interest of humanity and fundamental human decency, is to be indeed "blind" to the course of human events.